IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CR-23-00016-PRW |
| | ) |
| ROWDI PAGE LYNCH, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Before the Court is Defendant Rowdi Page Lynch's Motion to Suppress (Dkt. 23). For the reasons below, the Court **DENIES** the motion (Dkt. 23).

### *Background*

Ms. Lynch has been charged with being a felon in possession of firearms. The firearms were found on November 30, 2022, when the Lawton Police Department executed a search warrant of her residence. Ms. Lynch argues that there was no probable cause to search her residence, and that the evidence found must be suppressed.

The relevant facts are as follows: on February 9, 2022, Ms. Lynch was charged in Oklahoma County with three counts of being a felon in possession of a firearm and with unlawful carry of a firearm.[1] An arrest warrant was issued the same day.

---

[1] Oklahoma County District Court, Case No. CF-2022-636, https://www.oscn.net/dockets/GetCaseInformation.aspx?db=oklahoma&number=CF-2022-636&cmid=4050195 (*Docket Sheet*) (last visited March 6, 2024). The Court takes judicial notice of the docket sheet and related documents in Ms. Lynch's state criminal proceedings. *See United States v. Pursley*, 577 F.3d 1204, 1214 n.6 (10th Cir. 2009) (exercising discretion "to take judicial notice of publicly-filed records in [this] court and

1

On November 30, 2022, Detective Joshua Dawson of the Lawton Police Department received information that Ms. Lynch was in Lawton, driving a white Ford Flex. Detective Dawson spotted Ms. Lynch driving that Ford Flex, and contacted Sargeant Tally, a patrol officer, to inform him of the active warrant and direct him to execute a stop of Ms. Lynch.

Sgt. Tally encountered Ms. Lynch at the intersection of SW 17th Street and SW A Avenue, about a quarter of a mile from Ms. Lynch's residence. Sgt. Tally activated his lights, but Ms. Lynch continued slowly driving down A Ave. towards her home. At about SW 15th Street and A Avenue, about 500 feet from Ms. Lynch's residence, Sgt. Tally activated his siren, but Ms. Lynch continued slowly driving down A Ave. and turned into the entrance to the apartment building where she resided. Once stopped and approached by Sgt. Tally and Det. Dawson (who was following behind Sgt. Tally), Ms. Lynch initially refused to roll down the window of her car or exit the car. After several minutes of talking to the officers, Ms. Lynch finally unlocked the car and exited her vehicle. She was handcuffed and placed in the back of Sgt. Tally's patrol car. Ms. Lynch told the officers that she continued to her residence because she did not feel safe.

The officers decided to impound her car. While this decision was not explained in the police reports, Det. Dawson testified at the suppression hearing that the car was impounded despite it being parked on private property at her residence because the car was

---

certain other courts concerning matters that bear directly upon the disposition of the case at hand") (citation omitted).

registered to someone else, Ms. Lynch did not have valid insurance, and she had failed to yield when the Sgt. Tally attempted to stop her.[2]

Lawton Police Department Lieutenant Tom Bailey had now arrived on scene, and he conducted an inventory search of the car. In the car, Lt. Bailey found 6.2 grams of methamphetamine and a meth pipe in a bag.

Ms. Lynch was arrested and transported to the police station. Once there, Det. Dawson *Mirandized* and then interviewed Ms. Lynch. The interview was largely calm and non-confrontational. Det. Dawson repeatedly asked Ms. Lynch to tell him who had supplied her the methamphetamine. Ms. Lynch repeatedly denied knowledge of the methamphetamine and pipe. Det. Dawson told Ms. Lynch that he could make her drug charges "go away" if she gave him information about suppliers. Ms. Lynch repeatedly reminded Det. Dawson that she had been arrested due to the outstanding warrant for the gun charges, that she didn't want to talk about anything else, and that she didn't understand why Det. Dawson was interrogating her about other things. Ms. Lynch told Det. Dawson that she was scared and asked him to not involve her in anything else. Det. Dawson asked her what she was worried about. Ms. Lynch replied that she was worried about her dog, her car, and someone breaking into her home. When Det. Dawson asked why she was worried about someone breaking into her home, Ms. Lynch explained that is what happens when people find out someone is in jail.

---

[22] Ms. Lynch has not challenged the validity of the search of her car.

Det. Dawson asked Ms. Lynch what he would find if he searched her home. Ms. Lynch gave Det. Dawson a long look and then replied, "are you serious right now? That has nothing to do with this. You guys are bullying me." When Det. Dawson again insisted that he was trying to help Ms. Lynch, she again asked why she was being interrogated about drug suppliers when she had been picked up on an arrest warrant for possessing a gun. Det. Dawson explained that he was asking her questions about drugs because of the drugs found in her car, which "wasn't a lot" but "enough to pique" his interest. And while he didn't believe that talking to her would "get the meth out of Lawton" he "thought it could help." Det. Dawson never asked Ms. Lynch if she was a distributor of drugs. His questions focused on identifying her source of supply. When it became apparent Ms. Lynch wasn't going to provide information, the interview was terminated after about 20 minutes.

That same day, Detective Dawson completed an Affidavit for Search Warrant to search Ms. Lynch's residence for evidence of drug trafficking and distribution. The affidavit is largely boilerplate explanations of what evidence of trafficking and distribution might be found in the house, based on Det. Dawson's training and experience. The last page of the affidavit contains a recitation of the facts specific to Ms. Lynch. The affidavit seeks broad authorization to search the house and all its contents, including searches of any cell phones or other electronic devices found in the home. The facts that Det. Dawson relayed in the affidavit are as follows:

> On 11/30/2022 at approximately 1551 hours, Det. Dawson witnessed Rowdi Lynch driving a white Ford Flex bearing Oklahoma Tax MLD378. Dawson had checked Rowdi through Dispatch and verified she had an active felony warrant for felon in possession of a firearm out of Oklahoma County. Det. Dawson relayed this to Sgt. Tally who attempted to make a traffic stop. Tally

4

initiated the traffic stop at 17th and A. Ave. Lynch turned onto SW A Ave and continue [sic] driving. Sgt. Tally initiated his siren at approximately SW 15th and SW A and Lynch came to a stop at the stop sign and then continued to keep driving. Lynch pulled into 1311 SW A Ave and pulled into the back apartments before stopping. Det. Dawson arrived to back Tally and spoke with Lynch who was very uncooperative. Lynch advised she was scared, and that officer's [sic] were ruining her life by pulling her over. Lynch refused to unlock and open the door. After speaking with Lynch for approximately 10 minutes Lynch finally opened the door and was placed into handcuffs. Lt. Bailey began inventorying the vehicle for impound. During the inventory, inside a tote bag in the passenger seat was a baggy of methamphetamine weighing approximately 6.20g and a methamphetamine pipe.

Lynch was arrested for her felony warrant, possession of methamphetamine and possession of drug paraphernalia.

Det. Dawson read Miranda warning to Lynch who agreed to talk. Lynch denied the meth and meth pipe being hers. Lynch stated that she was worried that if she went to jail and people found out they would kick in her door and steal everything. When Det. Dawson asked what was in the apartment, Lynch became very defensive and said, "what does that have to do with anything," but never advised what was in the apartment.

With Lynch having methamphetamine on her person, through my training and experience, people that use and sell methamphetamine typically only carry a small amount on their person and keep the rest inside their residence.

At this time, I believe there is more methamphetamine inside the residence at 1311 SW A Ave.

Later that day, Comanche County Special Judge Grant Sheperd issued a warrant to search Ms. Lynch's residence. Det. Dawson and other officers executed the warrant and discovered a stolen Sig Sauer P238 .380 caliber pistol, a Westerfield 12-gauge shotgun, .380 caliber ammunition, 9mm caliber ammunition, 12-gauge ammunition, and a small amount of cocaine.

Ms. Lynch was charged in state court with simple possession of methamphetamine and paraphernalia for the methamphetamine and pipe in her car.[3] A federal grand jury returned an indictment against Ms. Lynch, charging her with one count of being a felon in possession of firearms.[4] Ms. Lynch filed a motion to suppress all evidence obtained from her residence. The Court held two hearings on the motion during which both parties were given the opportunity to introduce evidence. After argument on the legal questions presented, the Court took the matter under advisement.

## *Discussion*

*I. Probable Cause*

Lynch argues that the search warrant for her residence lacked a substantial basis to support Special Judge Sheperd's finding of probable cause.

"To be constitutional, a search warrant must issue only upon probable cause."[5] Probable cause "requires more than mere suspicion but less evidence than is necessary to convict."[6] To establish probable cause, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."[7] A judge issuing a search warrant based on

---

[3] Ex. 2 (Dkt. 23), at 2.

[4] A federal grand jury later returned a superseding indictment charging Ms. Lynch with an additional count of felon in possession of firearms arising out of the Oklahoma County case that had initially prompted Ms. Lynch's arrest by the Lawton Police Department. This Motion to Suppress does not challenge any aspect of that case.

[5] *United States v. Burns*, 624 F.2d 95, 99 (10th Cir. 1980).

[6] *Id.*

[7] *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000).

6

an affidavit must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place."[8] "The issuing judge is entitled to go beyond the averred facts and draw upon common sense in making reasonable inferences from those facts."[9]

A finding of probable cause also requires "a sufficient nexus between the [contraband] and the place to be searched[.]"[10] But "the nexus requirement—like probable cause itself—is not reducible to a neat set of legal rules . . . [and] little additional evidence is generally required to satisfy the Fourth Amendment's strictures."[11] Factors relevant to the Court's nexus analysis include: "(1) the type of crime at issue, (2) the extent of a suspect's opportunity for concealment, (3) the nature of the evidence sought, and (4) all reasonable inferences as to where a criminal would likely keep such evidence."[12] The "nexus between the place to be searched and the evidence sought may be established through normal inferences about the location of evidence."[13]

---

[8] *Illinois v. Gates*, 462 U.S. 213, 214 (1983).

[9] *United States v. Grimmett*, 439 F.3d 1263, 1270 (10th Cir. 2006).

[10] *United States v. Rowland*, 145 F.3d 1194, 1201 (10th Cir. 1998) (quoting *United States v. Dennis*, 115 F.3d 524, 530 (7th Cir. 1997)).

[11] *United States v. Biglow*, 562 F.3d 1272, 1279 (internal citations and quotations omitted).

[12] *Id.*

[13] *Id.* at 1280 (quoting *United States v. Tisdale*, 248 F.3d 964, 971 (10th Cir. 2001)).

"A district court reviewing the probable cause for a warrant puts itself in the shoes of the warrant's issuing jurist and gives substantial deference to the prior decision."[14] The "duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed."[15] "'[A]fter-the-fact, de novo scrutiny' of a magistrate's probable-cause determination is forbidden."[16]

In its response to the Motion to Suppress and at the hearings on the Motion, the United States described the three facts supporting probable cause to search Ms. Lynch's house as: (1) her possession of 6.2 grams of methamphetamine and a pipe, (2) the proximity of those drugs to her house, and (3) her defensiveness and refusal to answer questions about what was in her house. The United States agreed that that no one of these facts was sufficient to establish probable cause to search Ms. Lynch's house but argued that taken together they establish probable cause to believe that evidence of drug trafficking or distribution would be found in her house.

First, the 6.2 grams of methamphetamine and the pipe to smoke it that Lynch possessed is not inconsistent with personal use. Other than the amount of methamphetamine, which the United States argues is larger than normal for a user to be carrying, there is no other indicia of distribution. Indeed, the affidavit acknowledges that this is a "small" amount of methamphetamine but claims that people who use *and sell*

---

[14] *United States v. Moses*, 965 F.3d 1106, 1112 (10th Cir. 2020).

[15] *Gates*, 462 U.S. at 238–39.

[16] *Biglow*, 562 F.3d at 1281 (modification in original) (quoting *Massachusetts v. Upton*, 466 U.S. 727, 733 (1984)).

methamphetamine "typically only carry a small amount on their person and keep the rest inside their residence."[17] The United States also acknowledges that Ms. Lynch was not charged with possession of methamphetamine with intent to distribute, but argues that Oklahoma law does not require any particular amount of methamphetamine to be found to charge someone with intent to distribute. Det. Dawson explained at the hearing that Ms. Lynch was charged with mere possession because his district attorney's office won't charge someone with possession with intent to distribute without *some* indicia of distribution other than the small amount of drugs itself, and that he had no such evidence. Det. Dawson indicated that he wished to search Ms. Lynch's house for precisely that reason: he had insufficient evidence to support a distribution charge but hoped to find that evidence in her house. Det. Dawson also testified that Ms. Lynch (and more specifically her boyfriend) were on the Lawton Police Department's radar for possible involvement in a drug distribution organization, and that they had an open wire investigation into the organization. But Det. Dawson did not include any of those additional facts in his affidavit in support of probable cause.

      The Court agrees that Ms. Lynch's mere possession of 6.2 grams of methamphetamine and a pipe in her car does not establish probable cause for a wide-ranging search of her home for evidence of distribution or trafficking. To conclude otherwise would be to allow searches of the homes of anyone ever found with drugs on their person. And if the 6.2 grams of methamphetamine wasn't enough to establish

---

[17] Ex. 4 (Dkt. 23), at 6.

probable cause to *charge* her with intent to distribute, it alone cannot be enough to establish probable cause to search her home for evidence of distribution.

Nor does the fact that the methamphetamine was found in the drive outside of Ms. Lynch's home establish probable cause to believe that evidence of drug trafficking or distribution would be found in her home. Recall, the drugs were only found close to her home because officers attempted to stop her as she was headed home and a very short distance from her home. As Ms. Lynch explained, she continued the short distance to her driveway because she was scared and worried about her car. In the United States' view, Ms. Lynch's decision to continue to her home is indicative that she had something to hide in her home. In other words, Ms. Lynch was leading officers to her contraband. But on these bare facts, logic does not support that inference. The Court cannot conclude that probable cause to search a home is established whenever contraband is located near the home. Surely police cannot justify searches of homes anytime they elect to make a traffic stop near a person's home and then find contraband in the car. *Some* indicia of trafficking or distribution is necessary to establish a nexus between the small amount of drugs found in Ms. Lynch's car and her home, and none existed other than Det. Dawson's belief that more drugs were likely in the house.

Finally, Ms. Lynch's "defensiveness" and "refusal" to answer Detective Dawson's questions about the contents of her house likewise does not establish probable cause to search her home for contraband. The Court would not characterize Ms. Lynch's interaction with Det. Dawson about the contents of her home as "very defensive." In the Court's view, Ms. Lynch was simply responding to questions from Det. Dawson in precisely the way she

had responded to his questions up that point: by expressing a desire to not talk about anything other than her outstanding arrest warrant. Ms. Lynch's invocation of her right to remain silent by refusing to answer certain questions does not (and cannot) create probable cause to search her home. To conclude otherwise would be to allow investigating officers to ask detainees wide-ranging questions about potential criminal conduct and to construe any refusal to answer as evidence of guilt. At the same time, the Court cannot say that—in light of his knowledge of other evidence of Ms. Lynch's potential involvement with drug distribution or trafficking—that Det. Dawson's interpretation of his interaction with her about the contents of her home as "very defensive" was unreasonable. But again, none of those other facts were presented to the issuing judge in Det. Dawson's application for a search warrant.

With each of these facts alone being insufficient to establish probable cause to search Ms. Lynch's home for evidence of drug trafficking or distribution, the question becomes whether taken together, those facts provide a substantial basis to conclude that probable cause to search the home existed. They don't. The search warrant should not have issued.

## II. Good Faith Exception

But even if the warrant was infirm, the evidence need not be suppressed if the executing officers relied on the search warrant in good faith. The good-faith exception provides that the "exclusionary rule should not be applied to suppress evidence obtained by officers acting in objectively reasonable reliance on a search warrant issued by a

detached and neutral magistrate judge that is ultimately deemed invalid."[18] The rationale for this exception "is the underlying purpose of the exclusionary rule—namely, to deter police misconduct. When an officer acts in good faith, there is nothing to deter."[19] Thus, "the suppression of evidence obtained pursuant to a warrant should be ordered only in the unusual cases in which exclusion will further the purposes of the exclusionary rule."[20]

Here, the officers' "[r]eliance upon a warrant issued by a neutral magistrate creates a 'presumption . . . [that] the officer[s] [were] acting in good faith.'"[21] But this "good-faith presumption is not absolute."[22] Rather, an "officer's reliance on the defective warrant still must be objectively reasonable."[23] "An officer's reliance is objectively unreasonable when the warrant is based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"[24] "An affidavit lacks indicia of probable cause when it does not contain factual support."[25] The question is whether the affidavit is "*devoid* of factual support, not merely whether the facts they contain are legally sufficient."[26] "An affidavit devoid of factual support is 'one that merely states suspicions,

---

[18] *United States v. Russian*, 848 F.3d 1239, 1246 (10th Cir. 2017).

[19] *Id.*

[20] *United States v. Riccardi*, 405 F.3d 852, 863 (10th Cir. 2005).

[21] *United States v. Chambers*, 882 F.3d 1305, 1310 (10th Cir. 2018) (quoting *United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir. 1985)).

[22] *Id.*

[23] *Russian*, 848 F.3d at 1246.

[24] *Chambers*, 882 F.3d at 1310 (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)).

[25] *Id.* at 1310.

[26] *Cardall*, 773 F.2d at 1133 (emphasis in original).

beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.'"[27] "The affidavit does not have to be a model of specificity."[28] Rather, "[a]n affidavit has enough factual support to justify reliance if it establishes a minimally sufficient nexus between the illegal activity and the place to be searched."[29]

Ms. Lynch's sole argument as to why the good-faith exception shouldn't apply is that the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[.]" But while Ms. Lynch disagrees with the inference that Det. Dawson drew from the facts (that more drugs or other evidence of drug trafficking or distribution would be found in the house), she does not—and cannot—deny that the affidavit in support of the search warrant contained some facts arguably supporting Det. Dawson's inference. Det. Dawson presented his facts (minimal as they were) to a judge, that judge determined that probable cause existed, and Det. Dawson reasonably relied on that determination. The good faith exception applies.

## *Conclusion*

Accordingly, the Court **DENIES** Defendant Lynch's Motion to Suppress (Dkt. 23).

---

[27] *Chambers*, 882 F.3d at 1311 (quoting *United States v. Roach*, 582 F.3d 1192, 1204–05 (10th Cir. 2009)).

[28] *Id.*

[29] *United States v. Henderson*, 595 F.3d 1198, 1202 (10th Cir. 2010) (cleaned up).

**IT IS SO ORDERED** this 7th day of March 2024.

_____
PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE